**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: September 28 2018

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 16-33793 |
| | ) | |
| Randall Doll, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 17-03027 |
| | ) | |
| James Launder | ) | Judge John P. Gustafson |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Randall Doll, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF DECISION

This Adversary Proceeding is before the court for decision after trial on Plaintiff James Launder's ("Plaintiff") Complaint [Doc. #1] against Defendant Randall Doll ("Defendant-Debtor"). In the Complaint, Plaintiff seeks a determination that the debt owed to him by Defendant-Debtor is nondischargeable under 11 U.S.C. §523(a)(2) and (a)(6). [Doc #1, pp. 3-4].

The Court has jurisdiction over Defendant-Debtor's underlying Chapter 7 case and this adversary proceeding pursuant to 28 U.S.C. §§1334, 157(a), and Local General Order 2012–7 of

the United States District Court for the Northern District of Ohio. Actions to determine dischargeability are core proceedings that this Court may hear and determine. 28 U.S.C. §157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined all the submitted materials, weighed the credibility of witnesses, considered all of the admitted evidence,[1] and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that only a portion of Defendant-Debtor's debt owed Plaintiff, as reflected in Plaintiff's Proof of Claim, is nondischargeable and that the remainder is subject to Defendant-Debtor's discharge.

### Findings of Fact

Many of the following facts were previously set forth in the court's Memorandum of Decision and Order [Doc. #16] that denied Plaintiff and Defendant-Debtor's cross-motions for summary judgment. Defendant-Debtor owned and operated an automobile improvement business under the name "Randy's Body and Paint" located at 118 East Front Street, Pemberville, Ohio. [Doc. #13-2, p. 3]. On July 13, 2015, Defendant-Debtor and Plaintiff entered into an oral business agreement through which Defendant-Debtor agreed to perform repairs and improvements on a 1937 Ford replica kit car ("Ford Automobile Project" or "Ford kit car") in exchange for payment. [Doc. #12-1, p. 1; Doc. #13-2, p. 3]. As Defendant-Debtor performed work on the kit car, the terms of the underlying agreement came into dispute and on October 5, 2015, the Ford Automobile Project fell apart. At trial, the parties presented evidence on their very different views as to specifically how and why that happened.

On January 25, 2016, Plaintiff filed a complaint against Defendant-Debtor and "Randy's Body and Paint" in the Hancock County Court of Common Pleas, Case No. 2016 CV 30 ("State Court Action"), for money damages stemming from Defendant-Debtor's allegedly improper handling of the Ford Automobile Project. [Doc. #13, Pl. Ex. A]. Following Defendant-Debtor's failure to timely file a response to the complaint, Plaintiff filed a motion for default judgment. [Doc #13, Pl. Ex. B]. Defendant-Debtor again failed to timely respond and on March 16, 2016,

---

1/ Plaintiff's admitted exhibits are referred to as [Pl. Ex. __] and Defendant-Debtor's admitted exhibits via [Def. Ex. __].

2

the Hancock County Court of Common Pleas entered a Default Judgment ("Default Judgment") against Defendant-Debtor. [Doc. #1, Pl. Ex. C].

Defendant-Debtor attempted to file an Answer on March 22, 2016, but the Hancock County Court of Common Pleas vacated the late-filed Answer. [*Id.*, Pl. Ex. D, E]. Defendant-Debtor also filed a Motion for Relief from Judgment that was denied by the Hancock County Court of Common Pleas on June 13, 2016. [*Id.*, Pl. Ex. F, H].

On December 8, 2016, Defendant-Debtor filed a Chapter 7 Bankruptcy Petition. [Case No. 16-33793, Doc. #1]. Defendant-Debtor's Schedule E/F lists a debt owed to Plaintiff and describes it as a nonpriority unsecured claim with an unknown value. [*Id.*, p. 19]. Plaintiff timely filed an Adversary Complaint on April 3, 2017, seeking to have the debt of $22,109.50 owed him held nondischargeable. [Doc. #1].

Plaintiff's Adversary Complaint seeks relief on three counts. [*Id.*]. First, Plaintiff alleged that Defendant-Debtor's handling of the Ford Automobile Project constituted the taking of Plaintiff's money and property by false pretenses, false representation, or actual fraud under 11 U.S.C. §523(a)(2) and (a)(6). [*Id.*, p. 4]. Second, Plaintiff argued that Defendant-Debtor's retention of the body panels was willful, malicious, and a cause of economic injury under 11 U.S.C. §523(a)(6). [*Id.*]. Third, Plaintiff contended that the Hancock County Court of Common Pleas' Default Judgment binds the parties and entitles Plaintiff to a nondischargeability determination on theories of *res judicata* and collateral estoppel.[2] [*Id.*, p. 5].

In his timely filed Answer, Defendant-Debtor asserted that the Hancock County Court of Common Pleas' Default Judgment does not contain any findings of fact or law and is thus not due preclusive effect under theories of *res judicata* or collateral estoppel. [Doc. #4, p. 3]. Defendant-Debtor further contended that this Adversary Proceeding should be dismissed for Plaintiff's failure to state a claim upon which relief can be granted. [*Id.*].

Plaintiff and Defendant-Debtor filed cross-Motions for Summary Judgment [Doc. ##12, 13], both of which the court denied in a Memorandum of Decision and Order entered on March 6, 2018. [Doc. #16]. In that Decision, this court held that the Default Judgment could not be given preclusive effect in these proceedings and that genuine issues of fact rendered summary judgment

---

2/ The court has already found that the Hancock County Default Judgment is not due preclusive effect in these dischargeability proceedings [Doc. #16], so the court will limit its reference to the Default Judgment and *res judicata*/collateral estoppel issues accordingly.

inappropriate. [*Id.*].  The court then scheduled a trial to be held on July 18, 2018.

At the July 18th trial, Plaintiff, Plaintiff's counsel, Defendant-Debtor, and Defendant-Debtor's counsel attended in person.  Two witnesses for Plaintiff were also in attendance.  After the parties waived their opening statements, Plaintiff's counsel presented testimony from his first witness, David Rice ("Mr. Rice").

Mr. Rice testified that he had prior experience with automobile work, that he was a friend of both Plaintiff and Defendant-Debtor for over ten years, and that he had personal knowledge of what led to their dispute over the Ford Automobile Project.

After learning that Plaintiff wanted to find someone to perform work on a Ford kit car, Mr. Rice recommended that Plaintiff contact Defendant-Debtor, a man Mr. Rice knew to possess knowledge of, and skill in, automobile body and paint work.  However, Mr. Rice also recommended that Plaintiff only work with Defendant-Debtor if the two agreed to a flat, fixed price for the Ford Automobile Project.  Mr. Rice stated that he previously heard Defendant-Debtor complain about other customers that took issue with Defendant-Debtor's charging at an hourly rate.  Defendant-Debtor had stated to Mr. Rice that if he were to give prospective customers a flat price quote, he would never get any business.  Thus, Mr. Rice explained that while he wanted to help Defendant-Debtor obtain work through connecting him with Plaintiff and the Ford Automobile Project, he nevertheless recommended that Plaintiff get a flat price quote from Defendant-Debtor given Mr. Rice's prior conversations with Defendant-Debtor about his billing practices.

Mr. Rice connected Plaintiff with Defendant-Debtor via an exchange of telephone numbers and then accompanied Defendant-Debtor to Plaintiff's house in Findlay so that Defendant-Debtor could see the Ford kit car that he would be working on before the parties agreed to a deal. According to Mr. Rice, while the parties looked at the Ford kit car, Plaintiff told Defendant-Debtor that he would not pay an hourly rate and that Defendant-Debtor should look the car over, contemplate a fair flat fee, and then get back to Plaintiff with a price.  After Defendant-Debtor visited Plaintiff's house and first saw the Ford kit car, Mr. Rice called Defendant-Debtor and asked what he thought about the Ford Automobile Project.  According to Mr. Rice, Defendant-Debtor told Mr. Rice that he couldn't do the job for any less than $5,000.00.

Mr. Rice further testified that he was present when Plaintiff and Defendant-Debtor discussed and agreed to a price for the Ford Automobile Project.  Specifically, Mr. Rice stated

4

that he accompanied Plaintiff to Defendant-Debtor's body shop a second time, during which Plaintiff dropped off the first batch of Ford kit car parts. Mr. Rice asserted that, while there, he personally saw[3] Defendant-Debtor and Plaintiff shake hands and verbally agree to a flat $5,500.00 fee for the Ford Automobile Project, an amount that included $5,000.00 for the car and an extra $500.00 for undercoating work. According to Mr. Rice, the Ford kit car was practically "paint-ready" when Defendant-Debtor began work on it, though Mr. Rice admitted that he did not have knowledge of the Ford Automobile Project's timeline or payment plan details.

At some point after work on the Ford kit car had begun, Defendant-Debtor called Mr. Rice and informed him that his deal with Plaintiff had run into trouble and that the two had a falling out.

Plaintiff's next witness, Steve Russell, testified that he had been friends with Plaintiff for about ten years and that he accompanied him to Defendant-Debtor's body shop to drop off Ford kit car parts and pick up finished ones. Mr. Russell stated that he went to Defendant-Debtor's body shop alongside Plaintiff four or five times during September and early October of 2015. Mr, Russell averred that during each visit, Defendant-Debtor would complain about something having gone wrong with the parts that he had been working on. Specifically, Mr. Russell remembered that Defendant-Debtor had made mistakes while working on the Ford kit car's top and an armrest, mistakes that required additional work. Mr. Russell recalled that Plaintiff was not concerned about the mistakes because Plaintiff had told him that Defendant-Debtor had agreed to a fixed price.

On October 5, 2015, Mr. Russell and Plaintiff made a final visit to Defendant-Debtor's body shop. Mr. Russell testified that, while there, Plaintiff and Defendant-Debtor began arguing about the number of hours Defendant-Debtor had spent working on the Ford Automobile Project. Mr. Russell recalled overhearing Defendant-Debtor say, "Get your f'ing parts out of here!" after the parties could not resolve their dispute. Mr. Russell then recalled that he and Plaintiff loaded as many parts as they could into Plaintiff's truck, intending to return to Defendant-Debtor's body shop later that day to pick up the parts that would not fit.

During their return trip to Defendant-Debtor's body shop on October 5, 2015, Mr. Russell recounted that Plaintiff received a phone call from Defendant-Debtor in which Defendant-Debtor

---

3/ There was contrary evidence, given by both Plaintiff and Defendant-Debtor, that the agreement was actually reached during a phone call.

5

told Plaintiff that he would not give Plaintiff the remaining parts back until Plaintiff paid him. According to Mr. Russell, he and Plaintiff were then turned away from Defendant-Debtor's body shop after Defendant-Debtor stated that the remaining parts were no longer on-site. After calling the police and filing a report at a local police station,[4] Mr. Russell and Plaintiff left the area without the remaining Ford kit car parts. Mr. Russell recalled that the Ford kit car parts Defendant-Debtor held onto included fenders, running boards, the roof, armrests, and the center console. On cross-examination by Defendant-Debtor's counsel, Mr. Russell admitted that he was not present when Plaintiff and Defendant-Debtor discussed the terms of the Ford Automobile Project.

Upon taking the stand, Plaintiff testified that he had many years of experience in automobile paint and body work and that he sought out Defendant-Debtor after Mr. Rice mentioned that Defendant-Debtor would likely do a good job. Plaintiff testified that when he and Defendant-Debtor first discussed the Ford Automobile Project, he informed Defendant-Debtor that Defendant-Debtor should look the car over and come up with a fixed price that factored in incidental costs. Plaintiff explained that the Ford kit car was "more or less paint-ready" when Defendant-Debtor first saw it, that the Ford Automobile Project only included the preparation and painting of parts, not assembly or reconstruction, and that, prior to meeting Defendant-Debtor, he had already received a Ford Automobile Project cost quote of $3,500.00 from a third party.

Plaintiff testified that, after being warned about Defendant-Debtor's hourly pricing by Mr. Rice, he insisted that Defendant-Debtor come up with a flat rate fee and not an hourly rate. Plaintiff also explained that he and Defendant-Debtor did not agree to a specific fixed price at their first meeting. Plaintiff further testified that, some time after their first meeting and over the phone, he and Defendant-Debtor agreed to $5,000.00 initially, and then the two later agreed to add an additional $500.00 for undercoating work. According to Plaintiff, Mr. Rice had full knowledge of the parties having agreed to a $5,500.00 price because Plaintiff discussed the initial $5,000.00 figure with him. Further, Plaintiff testified that Mr. Rice was present when Plaintiff and Defendant-Debtor later agreed to the addition of $500.00 for undercoating work.

After delivering the first set of parts to Defendant-Debtor on August 31, 2015, Plaintiff gave him an initial payment of $1,500.00 via check. *See*, [Pl. Ex. 1, p. 2]. As Defendant-Debtor

---

4/ While Plaintiff presented testimony that related to an October 5, 2018 police report, no police report was entered into evidence. The parties stipulated that October 5, 2018 was the date that the Ford Automobile Project came to an end.

17-03027-jpg    Doc 25    FILED 09/28/18    ENTERED 09/28/18 15:42:38    Page 6 of 19

progressed on the Ford Automobile Project, Plaintiff paid him in two further installments of $1,500.00 and $500.00, with both checks dated September 21, 2015. *See*, [*Id.*, p. 1, 3]. On cross-examination, Plaintiff was unsure as to why he paid Defendant-Debtor in separate installments before the Ford Automobile Project was finished, but he believed that he did it "out of the kindness of his heart." Although Plaintiff testified that Defendant-Debtor had mentioned the number of hours he had spent on the Ford Automobile Project when discussing his progress, Plaintiff stated that he never considered whether Defendant-Debtor was charging him by the hour because he and Defendant-Debtor had originally agreed to a flat rate.

Plaintiff recalled that on October 5, 2018, the day the Ford Automobile Project fell into dispute, he and Defendant-Debtor argued over whether they had originally agreed on a fixed or hourly price. Having been unable to resolve their disagreement, Plaintiff further recalled that Defendant-Debtor then said, "Get your f'ing parts out of here, you don't owe me a GD [sic] dime!" After taking the parts that would fit in his truck to a friend's house nearby, Plaintiff recalled that, on the return trip to Defendant-Debtor's body shop, he received a telephone call from Defendant-Debtor. During that call, Defendant-Debtor informed Plaintiff that he would not return the remaining Ford kit car parts until Plaintiff paid him another $1,800.00, though Plaintiff was unsure as to the specific amount that was demanded. In response, Plaintiff told Defendant-Debtor that he would see him in court.

Plaintiff testified that, subsequent to the October 5, 2018 breakdown, he hired a Findley-area attorney named Bradley Warren, and then filed a lawsuit against Defendant-Debtor in the Hancock County Court of Common Pleas. Plaintiff also testified that, consistent with an affidavit he filed with the Hancock County court and the resulting default judgment, *see*, [Pl. Ex. 4, pp. 3-5; Pl. Ex. 5], he suffered $20,647.00 in monetary damages, plus $1,462.50 in attorney fees, as a result of Defendant-Debtor's handling of the Ford Automobile Project. Plaintiff testified that he arrived at the $20,647.00 cost figure by adding together the cost of the parts Defendant-Debtor withheld ($8,400.00), the cost of fixing Defendant-Debtor's mistakes ($7,060.00), the money he had already paid Defendant-Debtor ($3,500.00), and expenses incurred traveling to and from Defendant-Debtor's body shop ($1,687.00). *See*, [*Id.*].

On cross-examination, Plaintiff explained that fixing Defendant-Debtor's mistakes included repainting all of the parts, even the ones already worked on by Defendant-Debtor, because a new batch of paint would have to be prepared so that the colors exactly matched. Plaintiff

7

admitted that he had not yet spent any money on fixing Defendant-Debtor's mistakes and that he would be willing to subtract the cost of the parts retained by Defendant-Debtor from his claim because he had already been given those parts back. Plaintiff explained that, shortly after judgment was entered in the Hancock County lawsuit, he contacted the Wood County Sheriff's office and with their assistance, he retrieved the remaining parts from Defendant-Debtor's body shop.

Plaintiff further testified that, in his estimate, he also suffered damages in addition to the $22,109.50 given that he had lost an opportunity to sell the Ford kit car he believed would have been worth around $100,000.00 if it had been completed, though he also admitted that he had no present intention of selling the vehicle. Plaintiff was also presented with a document purporting to be an accounting of the work Defendant-Debtor performed on the Ford kit car. *See*, [Pl. Ex. 2; Def. Ex. A]. Plaintiff testified that the dates reflected on that document were inconsistent with the timeframe of the Ford Automobile Project.

Plaintiff's Exhibits One through Twelve were then admitted into evidence without objection. After admission of the exhibits, Plaintiff rested his case.

Upon taking the stand, Defendant-Debtor presented his version of the events that led to the termination of the Ford Automobile Project. Defendant-Debtor testified that he has been in the business of automobile restoration and body work for around 33 years. Defendant-Debtor explained that, for at least 20 years, he worked solely on an hourly fee basis and that currently, he usually worked at a $48-an-hour rate. Defendant-Debtor further explained that his girlfriend managed his body shop billing and account practices.

Defendant-Debtor testified that Mr. Rice had connected him with Plaintiff. After seeing the Ford kit car parts for the first time, Defendant-Debtor noticed that the preparation work that had already been done was not of high quality. A few weeks after initially seeing the parts, Defendant-Debtor testified that, during a phone call with Plaintiff, he gave Plaintiff a minimum estimate of $6,500.00. Defendant-Debtor recalled that, in response, Plaintiff said that he believed that Defendant-Debtor could do the work for $5,500.00 and that he ought "give it a shot" and that he would not hold Defendant-Debtor to the lower price if the Ford Automobile Project required more work. Defendant-Debtor agreed to "give it a shot" and testified that he began work on the Ford Automobile Project while keeping track of his hours. Defendant-Debtor explained that he understood Plaintiff's "give it a shot" statement to mean that the price was flexible and that time

8

was of the essence.

Defendant-Debtor testified that Plaintiff would drop off new parts, pick up finished ones, and then return with unfinished parts as Defendant-Debtor made progress on the project. Defendant-Debtor recounted that, once he began work on the parts, he discovered flaws that required additional work. Defendant-Debtor also recounted that he never discussed the additional $500.00 for undercoating work with Plaintiff, though he testified that he did perform the undercoating work, the need for which he only discovered after beginning the project. Defendant-Debtor explained that he did make a mistake while performing work on the project, but that he offered to fix it without additional cost. Defendant-Debtor testified that Plaintiff was otherwise happy with the work he was performing and that Plaintiff paid him via two checks on September 21, 2018 because Defendant-Debtor had explained to him that, given the hours he had spent working, he was owed more than one check for $1,500.00.

On October 5, 2018, Defendant-Debtor recalled that he and Plaintiff argued over how many hours Defendant-Debtor had spent on the Ford Automobile Project. Defendant-Debtor insisted that he was owed $1,800.00 for work he had already performed, and after Plaintiff refused to pay him that amount, he angrily told Plaintiff to take his parts and leave. Defendant-Debtor identified Plaintiff's Exhibit Two/Defendant's Exhibit A as a contemporaneous accounting of the hours he spent on the Ford Automobile Project prepared by his girlfriend. He explained that, by the time the project fell apart, he had worked over 80 hours on it.[5] He further explained that, had Plaintiff continued paying him by the hour, he would have finished the Ford Automobile Project.

On cross-examination, Defendant-Debtor explained that his girlfriend's accounting of the hours he worked on the Ford Automobile Project contained errors as to the days he performed work and that he was unsure as to why the dates did not match up with dates contained on the checks and police report. Defendant-Debtor surmised that his girlfriend must have made a mistake in her accounting. After Defendant-Debtor's Exhibits A and B were admitted without objection, Defendant-Debtor rested his case.

As a preliminary matter, the court finds that the evidence presented by both Plaintiff and

---

5/ Despite Defendant-Debtor's insistence that he was owed an additional $1,800.00 at the time the Ford Automobile Project fell into dispute, 80 hours of work at a rate of $48-an-hour amounts to $3,840.00, only $340.00 more than Defendant-Debtor had already been paid. Further, Defendant-Debtor's Exhibit, purporting to be a contemporaneous hourly accounting, states a rate of only $40-an-hour. *See*, [Pl. Ex. 2; Def. Ex. A]. There is no dispute that Defendant-Debtor had been paid $3,500, in checks for $1,500, $1,500, and $500.

9

Defendant-Debtor, while largely credible, is in equipoise in terms of outlining many of the disputed facts surrounding the Ford Automobile Project. Further, the court finds that neither Plaintiff nor Defendant-Debtor provided sufficient evidence of the terms of the agreement underlying the Ford Automobile Project. Thus, the court makes the following limited findings of fact necessary to the disposition of this case:

1. On August 31, 2015, Plaintiff and Defendant-Debtor entered into the Ford Automobile Project agreement through which Defendant-Debtor agreed to provide automobile body and paint services in exchange for Plaintiff's payment. That same day, Plaintiff dropped off the first batch of Ford kit car parts at Defendant-Debtor's body shop and paid Defendant-Debtor an initial payment of $1,500.00 via check. *See*, [Pl. Ex. 1, p. 2]

2. On September 21, 2015, Plaintiff picked up finished parts, dropped off additional parts, and paid Defendant-Debtor an additional $2,000.00 via two checks, one for $1,500.00 and the other for $500.00. *See*, [*Id.*, pp. 1, 3].

3. On October 5, 2015, Plaintiff and Defendant-Debtor had a falling out over the terms of the Ford Automobile Project and their agreement came to an end once Defendant-Debtor told Plaintiff to take his parts and leave. Plaintiff subsequently attempted to remove the Ford kit car parts from Defendant-Debtor's body shop, but could not fit all of them into his truck.

4. In an angry response to the parties' dispute over the Ford Automobile Project, Defendant-Debtor withheld from Plaintiff the Ford kit car parts that Plaintiff could not fit into his truck, claiming that he would not turnover the parts until Plaintiff paid him an additional $1,800.00.

5. In order to retrieve the remaining Ford kit car parts from Defendant-Debtor and in pursuit of damages related to the Ford Automobile Project dispute, Plaintiff filed a lawsuit against Defendant-Debtor in the Hancock County Court of Common Pleas and incurred attorney fees in the amount of $1,462.50. S*ee*, [Pl. Ex. 4, pp. 3-5].

6. Defendant-Debtor failed to timely contest the Hancock County state court lawsuit, and the Hancock County court entered Default Judgment against Defendant-Debtor [Pl. Ex. 5]. Subsequently, the Hancock County court denied Defendant-Debtor's Motion for Relief from Judgment. [Pl. Ex. 10].

7. As a result of the Hancock County state court lawsuit and with the Wood County

Sheriff's assistance, Plaintiff eventually retrieved the remaining Ford kit car parts from Defendant-Debtor's body shop shortly after the Hancock County court entered default judgment against Defendant-Debtor on March 16, 2016, 163 days after the Ford Automobile Project ended.

8. At the July 18th trial, Defendant-Debtor introduced a purported accounting of the hours he spent working on the Ford Automobile Project. *See*, [Pl. Ex. 2; Def. Ex. A]. To the extent Defendant-Debtor asserts that the accounting constituted a contemporaneous record of his work performed, the court finds that to be false.

## Conclusions of Law

### I. Exception to Discharge under §523(a)(2)(A) and (a)(6)

Plaintiff seeks a determination that the debt owed him by Defendant-Debtor in connection with the Ford Automobile Project is nondischargeable under 11 U.S.C. §523(a)(2)(A)[6] and (a)(6). Exceptions to discharge are strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998); *In re Livingston,* 372 F. App'x 613, 618 (6th Cir. 2010). Additionally, "[t]he objecting creditor bears the burden of proof by a preponderance of the evidence to establish the debt is of the type excepted from discharge." *Brann v. Oxford* (*In re Oxford*), 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010)(citing *In re Molino*, 225 B.R. 904, 907 (6th Cir. BAP 1998)); *see also*, *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

### II. 11 U.S.C. §523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services...to the extent obtained by[7] – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." In order to except a debt from discharge under this section, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3)

---

6/ While Plaintiff's Complaint only makes reference to §523(a)(2), the use of §523(a)(2)(A)'s "false pretenses, a false representation, or actual fraud" language, and the substance of its allegation directs the court's analysis.

7/ Enacted in 1984, the Bankruptcy Amendments and Federal Judgeship Act ("BAFJA") added the phrase "…to the extent obtained by…." to §523(a)(2).

11

the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

Under §523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Baker v. Wentland* (*In re Wentland*), 410 B.R. 585, 594 (Bankr. N.D. Ohio 2009)(quoting *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)). "False pretenses are distinguishable from false representations in that 'a false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an express representation.'" *Coughlin Chevrolet, Inc. v. Thompson* (*In re Thompson*), 458 B.R. 409, 421 (Bankr. S.D. Ohio 2011)(quoting *Goldberg Securities, Inc. v. Scarlata* (*In re Scarlata*), 127 B.R. 1004, 1009 (N.D. Ill. 1991)); *see also*, *Wentland*, 410 B.R. at 594.

In addition to "false representation" and "false pretenses," the Supreme Court has held that §523(a)(2)(A) also provides a cause of action for "actual fraud," or fraud that "[does] not require a misrepresentation from a debtor to a creditor." *Husky Int'l Elecs., Inc. v. Ritz*, ___U.S.___, 136 S.Ct. 1581, 1587, 194 L.Ed.2d 655 (2016); *see also, Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001). "'Actual fraud' includes fraudulent transfers and "fraudulent conduct" that deals in "acts of concealment and hindrance." *Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1587.

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained through review of the totality of the circumstances. *Rembert,* 141 F.3d at 281-82; *see also*, *Oxford*, 440 B.R. at 777. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," given that direct, express proof of intent is rarely available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (6th Cir. BAP 1999) (quoting *Hunter v. Sowers* (*In re Sowers*), 229 B.R. 151, 159 (Bankr. N.D. Ohio 1998)); *Oliver v. Zimmerman* (*In re Zimmerman*), 567 B.R. 521, 526 (Bankr. N.D. Ohio 2017); *Risk v. Hunter* (*In re Hunter*), 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015); *Chase Bank v. Brumbaugh* (*In re Brumbaugh*), 383 B.R. 907, 912 (Bankr. N.D. Ohio 2007); *EDM Machine Sales v. Harrison* (*In re Harrison*), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003); *Oxford*, 440 B.R. at 777.

Thus, where a debtor's subjective intent is at issue, summary judgment is generally inappropriate unless all reasonable inferences defeat the claims of the opposing party. *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 327 (Bankr. N.D.Ohio 2006)(citing *Hoover v. Radabaugh*,

17-03027-jpg    Doc 25    FILED 09/28/18    ENTERED 09/28/18 15:42:38    Page 12 of 19

307 F.3d 460, 467 (6th Cir. 2002)("When the defendants' intent is at issue, summary judgment is particularly inappropriate.")). In contrast, at trial: "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Zimmerman*, 567 B.R. at 526; *Wentland*, 410 B.R. at 594; *Buckeye Retirement Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 427 (Bankr. S.D. Ohio 2008).

In this case, upon review of the evidence and testimony presented at the July 18th trial, the court finds that Plaintiff has failed to sustain his burden in terms of establishing that Defendant-Debtor intended to deceive him when Defendant-Debtor began work on the Ford Automobile Project. The evidence presented suggests that Plaintiff and Defendant-Debtor, both strong-willed individuals, had different concepts of what the agreement was in their own minds. While Defendant-Debtor arguably committed some form of fraud in asserting that his girlfriend's accounting represented a contemporaneous accounting of the hours worked, that happened after the last payment was made on the Ford Automobile Project and only "the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt." *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998). Accordingly, the focus of a §523(a)(2)(A) analysis is on whether the debt at issue arises from a fraudulent act or actions. In this case, Plaintiff has not established that Defendant-Debtor's debt owed him can be traced to any fraudulent act. *See*, *Id.*; *see also*, *Ghadimi v. Ashai* (*In re Ashai*), 211 F.Supp.3d 1215, 1237-38 (C.D. Cal. 2016)(collecting cases holding that §523(a)(2)'s "to the extent obtained by" language precludes a finding of nondischargeability where the fraudulent misrepresentation occurred after the debt arose); *Weems & Stephens Equine Hosp., Inc. v. Hancz* (*In re Hancz*), 2010 WL 3909959 at \*3, 2010 Bankr. LEXIS 3473 at \*\*7-10 (Bankr. N.D. Ill. September 30, 2010)(finding that a fraudulent statement made after the debt at issue arose could not support a finding of nondischargeability under §523(a)(2)(A)).

In terms of the *Rembert* test, the court finds that Plaintiff's §523(a)(2)(A) claim fails to meet the first two elements.[8] The first element, requiring a "material misrepresentation,[9]" was

---

8/ Because of the Plaintiff's failure to establish the first two elements of the *Rembert* test, the third and fourth *Rembert* elements will not be addressed.

9/ Additionally, Plaintiff is unable to demonstrate that Defendant-Debtor committed "actual fraud" as outlined in *Husky*. Instead of tending to show that Defendant-Debtor partook in fraudulent conduct or other fraudulent acts aside from a misrepresentation, the evidence presented indicates that the parties entered into an indefinite agreement, on which their minds had not met, as Defendant-Debtor began work on the Ford Automobile Project.

not met because Plaintiff failed to demonstrate that Defendant-Debtor made material misrepresentations prior to the final payment made on the Ford Automobile Project. Although Plaintiff presented a great deal of evidence showing why he thought Defendant-Debtor had agreed to a flat rate, Defendant-Debtor's testimony regarding his understanding of "the deal" – in his own mind – was credible.

The court finds credible Defendant-Debtor's testimony to the effect that Plaintiff cajoled Defendant-Debtor to "give it shot," which each party interpreted differently. The agreement at issue was reached by two strong-willed individuals who were used to getting "their way." They each thought they were going to make the deal work in the way they separately envisioned it.[10] The issue here is not, "was there a contract?" The issue here is, "was there fraud?" Accordingly, the court finds that while some type of contract was formed (albeit with some missing terms), Plaintiff has not established that Defendant-Debtor made a material misrepresentation.

For similar reasons, Plaintiff's claim also fails to meet the second *Rembert* element, a showing of fraudulent intent. Without an independently significant source of evidence outlining the terms of the agreement underlying the Ford Automobile Project, the court finds that Plaintiff is unable to demonstrate that Defendant-Debtor intended to deceive Plaintiff before or during the time he worked on the project. Put simply, the evidence presented suggests that each party had their own vision of what the terms of the project were and, in the context of a trial on a §523(a)(2)(A) claim, "[i]f there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Zimmerman*, 567 B.R. at 526. Given that the conflicting evidence presented allows for an inference of honest intent on the part of Defendant-Debtor, the court finds that Plaintiff has failed to demonstrate that Defendant-Debtor intended to deceive him before or during the time he was working on the Ford Automobile Project. *See*, *Id.*; *see also*, *Hunter*, 535 B.R. at 218 ("Without any demonstration of an intent to deceive, proof of a breach of contract does not support a Section 523(a)(2)(A) finding.").

---

10/ The court notes that the evidence presented suggests that a true meeting of the minds never occurred and that an express contract between the parties may never have actually been agreed to. *See*, *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991)("To declare the existence of a contract, the parties must consent to the contractual terms, there must be a meeting of the minds, and the contract must be definite and certain."). However, even in the absence of an express contract, a contract implied in law, or quasi-contract can arise, giving rise to some right to payment. Regardless of the proper label to be attached to the agreement that led to the commencement of performance, because the Hancock County Default Judgment established the existence of Defendant-Debtor's debt owing from the Ford Automobile Project, the exact nature of the contract that existed between the parties is not at issue here.

17-03027-jpg    Doc 25    FILED 09/28/18    ENTERED 09/28/18 15:42:38    Page 14 of 19

In sum, the court finds that Plaintiff has not sustained his burden under §523(a)(2)(A) because he has not established that Defendant-Debtor made material misrepresentations that caused Plaintiff to enter into the Ford Automobile Project. Further, Plaintiff has not shown that Defendant-Debtor committed "actual fraud." Finally, while there is evidence of an intent to deceive at the time the Ford Automobile Project was terminated, Plaintiff was not induced to pay any money or turnover any property to Defendant-Debtor after that attempted deception. Thus, Plaintiff's claim under §523(a)(2)(A) will be denied.

**III.     11 U.S.C. §523(a)(6)**

Section 523(a)(6) provides that a debt arising out of a "willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from the discharge injunction. *See*, *Dardinger v. Dardinger* (*In re Dardinger*), 566 B.R. 481, 493 (Bankr. S.D. Ohio 2017). Given that the word "willful" directly modifies the word "injury," "nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Schafer v. Rapp* (*In re Rapp*), 375 B.R. 421, 435-36 (Bankr. S.D. Ohio 2007)(quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 976-77, 140 L.Ed.2d 90 (1988)). A "willful" injury is one where the debtor "either desires to cause the consequences of his actions or believes 'that the consequences are substantially certain to result' from his actions." *Id.* at 436 (quoting *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999)(internal quotations omitted)); *see also*, *Monsanto Co. v. Trantham* (*In re Trantham*), 304 B.R. 298, 307 (6th Cir. BAP 2004). In other words, the debtor "must will or desire harm, or believe injury is substantially certain to occur as a result of his behavior." *Markowitz*, 190 F.3d at 465 n. 10; *Trantham*, 304 B.R. at 307.

Not only must the injury be "willful," it must also be "malicious" in order satisfy §523(a)(6). A "malicious" injury is one where the debtor has acted "in conscious disregard of [his] duties or without just cause or excuse." *Dardinger*, 566 B.R. at 493 (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)); *see also*, *Gonzalez v. Moffitt* (*In re Moffitt*), 252 B.R. 916, 923 (6th Cir. 2000). Conscious disregard of duty or a lack of justification is sufficient; the debtor does not need to "act with ill will, spite, or animosity towards the injured party" to have acted maliciously within the meaning of §523(a)(6). *Rapp*, 375 B.R. at 436 (citing *Grange Mut. Cas. Co. v. Chapman* (*In re Chapman*), 228 B.R. 899, 909 (Bankr. N.D. Ohio 1998)).

15

A subjective intent to injure, as well as "malice", can be inferred from surrounding circumstances. *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002); *Albarran v. New Form, Inc. (In re Albarran)*, 347 B.R. 369, 384 (9th Cir. BAP 2006); *Jennings v. Bodrick* (*In re Bodrick*), 558 B.R. 848, 853 (Bankr. S.D. Ohio 2016); *Web v. Web (In re Web)*, 525 B.R. 226, 233 (Bankr. M.D. Pa. 2015); *United States v. Shelmidine* (*In re Shelmidine*), 519 B.R. 385, 393 (Bankr. N.D.N.Y. 2014); *Tenet S. Fulton, Inc. v. Demps* (*In re Demps*), 506 B.R. 163, 172 (Bankr. N.D. Ga. 2014); *Allison v. Dean (In re Dean)*, 2013 WL 1498305 at *4, 2013 Bankr. LEXIS 1471 at *9 (Bankr. M.D. Ala. April 10, 2013); *Harr v. Harr* (*In re Harr*), 2000 WL 620799 at *6, 2000 Bankr. LEXIS 401 at *16 (Bankr. S.D. Ohio March 24, 2000).

Here, the court finds that Plaintiff has sustained his burden in terms of establishing that Defendant-Debtor's withholding of Ford kit car parts constitutes a willful and malicious injury under §523(a)(6). First, the court finds that the evidence and testimony presented tended to show that Defendant-Debtor intended to injure Plaintiff when he withheld the Ford kit car parts in response to their argument over the terms of the Ford Automobile Project. Defendant-Debtor not only admitted that his October 5, 2015 argument with Plaintiff had made him angry, he first told Plaintiff to take his parts and leave, only to later insist that he would only release the remaining parts if Defendant-Debtor paid him additional money.

Further, any argument by Defendant-Debtor that he held onto the parts because of an honest belief that he was owed additional money for hours of work performed is contradicted by the fact that his girlfriend's hourly accounting contained many errors, errors that indicate that Defendant-Debtor likely had very little, if any, contemporaneous sense of what he was owed as he refused to give Plaintiff his parts back. Instead, the evidence presented indicates that Defendant-Debtor refused to turnover the Ford kit car parts because he was angry that Plaintiff refused to pay him any additional monies and ended the work.

For example, despite Defendant-Debtor's insistence that he was owed an additional $1,800.00 for work performed as of October 5, 2015, Defendant-Debtor's asserted current hourly rate of $48.00[11] and his oral testimony estimating "at least" 80 hours of work, comes to just $3,840.00. Thus, even if the parties had agreed to an hourly fee, Defendant-Debtor's testimony suggests that he was only owed about $340.00 when the Ford Automobile Project fell into dispute

---

11/ As noted above, Defendant-Debtor's exhibit purporting to be an accounting of the hours he spent working on the Ford Automobile Project states an hourly rate of only $40.00. *See*, [Pl. Ex. 2; Def. Ex. A].

16

given that Plaintiff had already paid him $3,500.00. This inconsistency bolsters the court's finding that Defendant-Debtor did not have a good faith basis for holding onto the remaining Ford kit car parts. Accordingly, the court finds that Defendant-Debtor's refusal to turnover the leftover Ford kit car parts constituted an intentional injury. *See*, *Geiger*, 523 U.S. at 61, 118 S.Ct. at 976-77. In other words, the court finds that Defendant-Debtor subjectively "will[ed] or desire[d] harm" when he held onto the Ford kit car parts. *See*, *Markowitz*, 190 F.3d at 465 n.10.

As for the showing of malice required under §523(a)(6), the court finds that Defendant-Debtor "acted in conscious disregard" of his duty to Plaintiff in refusing to turnover the remaining Ford kit car parts once the deal fell apart. *See*, *Dardinger*, 566 B.R. at 493. Despite the fact that he ended the Ford Automobile Project by telling Plaintiff to take his parts and leave, Defendant-Debtor nevertheless went back on his word and refused to give back the remaining parts until Plaintiff obtained a judgment in the Hancock County state court and showed up at Defendant-Debtor's body shop with the Wood County Sheriff in tow. Further, the court finds Defendant-Debtor's withholding of the Ford kit car parts to have been without justification. Notably, the document offered by Defendant-Debtor as justification could not have been prepared on or about the time the work was done because the dates were off by approximately one month. Any idea that one would record a September date as a day in October must be rejected. *Cf.*, *Rapp*, 375 B.R. at 436 (citation omitted).

Moreover, even if Defendant-Debtor believed that his view of the agreement was "the deal," he could not reasonably believe that he was actually entitled to the payment of a sum certain when the deal fell apart. There is no evidence that contemporaneous time records had been kept. Wanting more money for work that was done does not equate to a legal right to payment. Importantly, the common law garageman's lien arises for "labor and materials" used to repair a motor vehicle and requires that the value of the labor and materials used exceed the monies already paid.[12] There is no evidence that Defendant-Debtor had kept the kind of time records needed to make that calculation. Nor was there any evidence – even accepting that "give it a try" might represent consent to conversion to an hourly rate – that Plaintiff ever agreed to a specific hourly rate.

---

12/ *See*, *Dymarkowski v. Savage* (*In re Hadley*), 541 B.R. 829, 841-42 (Bankr. N.D. Ohio 2015)(describing Ohio garageman's lien law as arising "when labor and materials are expended in repairing a motor vehicle"), *aff'd*, 561 B.R. 384 (6th Cir. BAP 2016).

17-03027-jpg    Doc 25    FILED 09/28/18    ENTERED 09/28/18 15:42:38    Page 17 of 19

Further, the evidence in the form of unreliable, misdated time-records, [Pl. Ex. 2; Def. Ex. A], supports a finding that Defendant-Debtor did not have time records prepared when the dispute with Plaintiff arose. Defendant-Debtor's testimony that he charged an hourly rate of $48.00 further undercuts his credibility on this issue because the time-records reflect an hourly rate of only $40.00. The same can be said of Defendant-Debtor's insistence that he was owed $1,800.00 when the project ended given that the rate he testified to would only amount to an outstanding $340.00 were it to be believed.[13] Accordingly, the court finds that Defendant-Debtor acted without justification when he refused to turnover the remaining Ford kit car parts.

Turning to damages, the court finds that the $1,462.50 in attorney fees incurred by Plaintiff in bringing the Hancock County lawsuit are nondischargeable under §523(a)(6) because Plaintiff was forced to file suit in order to have his property returned. In fact, Plaintiff did not receive the parts back until shortly after judgment had been entered against Defendant-Debtor. Thus, the attorney fees were required to be expended to undo the harm Plaintiff suffered as a result of Defendant-Debtor's willful and malicious retention of the Ford kit car parts. Further, given the evidence presented regarding the lost time and use of the vehicle incurred by Plaintiff due to the wrongful retention of the parts, the court finds damages at a rate of $20 per day to be reasonable. Accordingly, because Defendant-Debtor held onto the remaining Ford kit car parts for roughly 163 days (October 5, 2015-March 16, 2016), the court finds that an additional $3,260.00 of Plaintiff's claim is nondischargeable under §523(a)(6). Added together, the court finds that, of the $22,109.50 owed Plaintiff by Defendant-Debtor, $4,722.50 is nondischargeable under §523(a)(6).

Lastly, because the evidence supports a finding that Plaintiff was the paint used by Defendant-Debtor was included as part of the agreement, the court will order that Defendant-Debtor turnover to Plaintiff the remaining paint, or an additional $1,000.00 will be held nondischargeable. Turnover of the paint will be through the parties' counsel. If Defendant-Debtor has not returned the paint in unaltered condition, the additional $1,000.00 will be added to the Judgment as a non-dischargeable debt. The paint is to be turned over within 30 days of entry of judgment.

## IV. Conclusion

---

13/ $1,800 equals 37.5 hours, at $48 per hour. $340 equals about 7 hours at $48 per hour. To believe that Defendant-Debtor was owed $1,800, one would have to believe that he had worked 110 hours on the project, and yet he could only say he worked "at least" 80 hours at trial. Of course, the numbers are even worse for Debtor-Defendant if the $40 per hour figure used in the "time records" is credited. *See*, [Pl. Ex. 2; Def. Ex. A].

17-03027-jpg    Doc 25    FILED 09/28/18    ENTERED 09/28/18 15:42:38    Page 18 of 19

Accordingly, the court finds that Plaintiff's claim under §523(a)(2)(A) fails because he has not produced sufficient evidence to meet his burden of proof that Defendant-Debtor intended to defraud him during the course of the Ford Automobile Project. In contrast, the court finds that Plaintiff's §523(a)(6) claim has merit and finds that $4,722.50 of the $22,109.50, given its relation to Defendant-Debtor's willful and malicious injury, is nondischargeable under §523(a)(6).

THEREFORE, for the foregoing reasons, good cause appearing,

IT IS ORDERED that Judgment in favor of Plaintiff will be granted in part, and denied in part. A separate entry of Judgment will be entered by the court contemporaneously with this Memorandum.

IT IS FURTHER ORDERED that Defendant-Debtor must turnover to Plaintiff the paint left over from the Ford Automobile Project within 30 days of entry of Judgment. If Defendant-Debtor fails to do so, an additional $1,000.00 will be held nondischargeable.